## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRATERNAL ORDER OF POLICE, MIAMI LODGE 20, INSURANCE TRUST FUND on behalf of itself and all others similarly situated, | ) ) ) ) | CASE NO. |
| *Plaintiff*, | ) ) | |
| v. | ) ) | <u>CLASS ACTION COMPLAINT</u> |
| LANNETT COMPANY, INC. and MYLAN PHARMACEUTICALS, INC. | ) ) ) | <u>JURY TRIAL DEMANDED</u> |
| *Defendants*. | ) ) ) | |

## <u>INTRODUCTION</u>

1.      Plaintiff Fraternal Order of Police, Miami Lodge 20, Insurance Trust Fund ("FOP Miami" or "Plaintiff"), on behalf of itself and all others similarly situated, brings this class action for claims under federal and state antitrust and consumer protection laws and the common law of unjust enrichment to recover damages and to obtain injunctive and equitable relief for the injuries it and others similarly situated have sustained against Lannet Company, Inc. and Mylan Pharmaceuticals Inc. (collectively "Defendants") arising from their conspiracy to fix, raise, maintain and stabilize the prices of certain levothyroxine sodium tablets ("Levothyroxine") in the United States during the period of February 1, 2013 through the present or the date on which the anticompetitive effects subside (the "Class Period"), in the states and districts identified below, and to allocate markets and customers for those products during the same time period.  All allegations herein are based on review of publicly available documents, counsel's investigation, Plaintiff's personal knowledge as to itself, and information and belief.

2.      Levothyroxine is a synthetic version of thyroxine, the hormone produced by the thyroid gland and is used to treat individuals whose thyroid is under producing thyroxine.

3.     Generic versions of Levothyroxine have been on the market for years, and prior to approximately 2013, sold for around $0.25 per 300 microgram pill and $0.13 per 125 microgram pill.  This was a direct result of competition spurred by the presence of various generic drugs, which benefit consumers and third-party payors through lower prices.

4.     Over the past four years, however, Levothyroxine has seen unprecedented and astounding price increases. Since approximately early-2013, the price of 300 micrograms of Levothyroxine has soared to **more than 237%** of its prior prices, while the price of the 125 microgram formulation has increased by **more than 267%** of its prior prices.

5.     These price increases did not stem from competitive behavior caused by, for instance, supply shortages or changed product demand.  Rather, they were the scion of Defendants' broad and wide-ranging conspiracy to fix, raise, maintain and stabilize the prices of these products, and to allocate customers and markets for them.  Defendants effectuated their conspiracy by direct business-to-business contacts among generic drug manufacturers, secret communications and meetings, and/or joint participation taken under the guise of trade associations like the Generic Pharmaceutical Association ("GPhA").

6.     Defendants' conspiracy has further benefited from oligopolistic market conditions, caused by the low number of competitors and barriers to entry in the Levothyroxine market. Such conditions have allowed Defendants to sustain anticompetitive behaviors such as their increased pricing as of the filing of this Complaint.

7.     Recently, price increases for generic drugs have garnered scrutiny from federal and state governments alike. The Department of Justice ("DOJ") and the Connecticut Attorney General's Office ("CTAG") have both issued subpoenas to as many as a dozen generic drug companies concerning prices of at least two dozen drugs. The DOJ's subpoenas arose from a grand

jury proceeding in the Eastern District of Pennsylvania that is investigating whether Defendants and other drug manufacturers conspired to fix generic drug prices.

8.      DOJ's and CTAG's investigations began in the summer of 2014, with both of these agencies issuing subpoenas to Defendants concerning anticompetitive practices in the generic pharmaceutical industry.

9.      Congress has taken notice of the price increases as well.  Rep. Elijah Cummings, Ranking Member of the House Committee on Oversight and Government Reform, and Sen. Bernie Sanders, Chairman of the Subcommittee on Primary Health and Aging of the Senate Committee on Health, Education, Labor and Pensions, have each written letters to Defendants to request information concerning their sales of other generic drugs that have experienced similar increases. Such drugs include digoxin, doxycycline, albuterol sulfate, glycopyrrolate, divalproex sodium ER, neostigmine methylsulfate, and benazepril/hydrochlorothiazide.

10.      Defendants received a letter from Senator Bernie Sanders and Congressman Elijah E. Cummings in October 2014 requesting information concerning their pricing of generic drugs.[1]

11.      Rep. Cummings and Sen. Sanders launched their investigations on the basis of drug price information that they compiled after the increases were recorded.[2] This information shows the stunning rise in generic prices during the relevant time period:

12.      Most recently, on December 12, 2016 the DOJ filed criminal informations against Jeffrey Glazer ("Glazer") and Jason Malek ("Malek"), respectively the former Chief Executive Officer and President of Heritage Pharmaceutical, Inc.  These criminal informations accused

---

[1] These investigations concern generic drugs and Plaintiff reserves the right to amend its Complaint to add more parties and/or more claims as additional information is revealed.
[2] http://www.sanders.senate.gov/download/face-sheet-on-generic-drug-price-increases?inline=file.

Malek and Glazer of conspiring to "knowingly enter[] into and engag[ing] in a combination and conspiracy with other persons and entities engaged in the production and sale of generic pharmaceutical products, including doxycycline hyclate, the primary purpose of which was to allocate customers, rig bids, and fix and maintain prices of doxycycline hyclate sold in the United States."[3]

13.    Additionally, on December 14, 2016, the attorneys general ("AG") of twenty states filed a complaint against multiple generic manufacturers of doxycycline hyclate for conspiring to fix the prices and allocate the market for this medication.[4]

14.    Significantly, both the DOJ informations as well as the AG Complaint indicate that these actions by the generic manufacturers of doxycycline hyclate were not isolated and limited to that drug.  The AG Complaint mentions a "wide-ranging series of conspiracies implicating numerous different drugs and competitors."[5]

15.    The AG Complaint acknowledged that "[m]ost of the conspiratorial communications were intentionally done in person or by cell phone, in an attempt to avoid creating a record of their illegal conduct. The generic drug industry, through the aforementioned opportunities to collude at trade shows, customer events and smaller more intimate dinners and meetings, allowed these communications to perpetuate. When communications were made in writing, or by text message, some of the Defendants even took overt and calculated steps to destroy evidence of those communications."[6]

---

[3] "Information," p. 2 (December 12, 2016) (ECF No. 1) in *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa.); "Information," p. 2 (December 12, 2016) (ECF No. 1) in *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa.).
[4] *State of Connecticut v. Aurobindo Pharma USA, Inc*., No. 3:16-cv-2056 VLB (D. Conn.).
[5] *Id*. at ¶9.
[6] *Id*. at ¶13.

16.     Defendants' conspiracy to fix, raise, maintain and stabilize the prices of Levothyroxine has caused and continues to cause consumers and third-party payors to pay supracompetitive prices for Levothyroxine tablets.

17.     Plaintiff seeks to certify two classes. The first class (the "Injunctive Class") is a national injunctive class of persons or entities in the United States and its territories who purchased, paid and/or provided reimbursement for some or all of the purchase price of generic Levothyroxine products manufactured by Defendants during the Class Period.

18.     The second class (the "Damages Class") includes all persons or entities who purchased, paid and/or provided reimbursement for some or all of the purchase price of generic Levothyroxine products manufactured by Defendants during the Class Period in the states identified herein and the District of Columbia.

## JURISDICTION AND VENUE

19.     Plaintiff brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26), for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the Class Members by reason of violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).

20.     This action is also instituted under the antitrust, consumer protection, and common laws of various states for damages and equitable relief, as described in the Claims for Relief below.

21.     Pursuant to 28 U.S.C. §§ 1331 and 1337, Section 16 of the Clayton Act (15 U.S.C. §26), and 28 U.S.C. § 1367, jurisdiction is conferred upon this Court.

22.     Pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C § 1391(b), (c) and (d), venue is proper in this judicial district because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected

interstate trade and commerce described below has been carried out in this District. Therefore, it is likely that acts in furtherance of the alleged conspiracy took place here. Venue is also proper in this District because the federal grand jury investigating the pricing of generic drugs is empaneled here.

23.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold Levothyroxine throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and/or (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## **PARTIES**

24.     Plaintiff FOP Miami is a governmental plan established and funded through contributions from the City of Miami and the plan's members, who are current and retired sworn officers from the City of Miami Police Department and their dependents. FOP Miami was established pursuant to a duly executed Trust Agreement for the purpose of providing medical, surgical and hospital care or benefits, including prescription drug benefits, to its members. FOP Miami maintains its principal place of business at 400 NW 2nd Avenue, Miami, Florida, and is a citizen of Florida.  During the Class Period, FOP Miami purchased and paid for some or all of the purchase price for one or more Levothyroxine prescription in Alabama, Colorado, Florida, Georgia, Mississippi, North Carolina, South Carolina, and Tennessee, thereby suffering injury to its business and property.  FOP Miami paid and reimbursed more for these products than it would

have absent Defendants' anticompetitive conduct to fix, raise, maintain, and stabilize the prices and allocate markets and customers.

25.     Defendant Lannett Company, Inc. ("Lannett") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 13200 Townsend Road, Philadelphia, PA 19154.  Lannett manufactures, markets, and sells generic drug products.  During the Class Period, Lannett sold generic Levothyroxine to customers in this District and other locations in the United States.

26.     Defendant Mylan Pharmaceuticals Inc. ("Mylan") is a West Virginia corporation with its principal place of business at 781 Chestnut Ridge Road, Morgantown, West Virginia 26505.  Mylan manufactures, markets, and sells generic drug products. During the Class Period, Mylan sold generic Levothyroxine to customers in this District and other locations in the United States.

27.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

28.     All acts alleged in this Complaint to have been done by Defendants were performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of Defendants' business affairs.

## CO-CONSPIRATORS

29.     Various other persons, firms, corporations and entities have participated as unnamed co-conspirators with Defendants in the violations and conspiracy alleged herein. In order

to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.

30.     At all relevant times, each Defendant was an agent of each of the remaining Defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency. Each Defendant ratified and/or authorized the wrongful acts of each of the Defendants. Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts and transactions that are the subject of this action.

## INTERSTATE AND INTRASTATE TRADE AND COMMERCE

31.     The business activities of Defendants that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

32.     During the Class Period, Defendants sold substantial quantities of generic Levothyroxine in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States.

33.     Defendants' anticompetitive conduct has substantial intrastate effects in that, *inter alia*, generic Levothyroxine has been and is offered at higher prices to end-payors inside each respective state than they would have been or would be but for Defendants' conduct. The complete lack of availability of competitive priced generic Levothyroxine directly impacts and disrupts commerce for end-payors within each state.

34.     Defendants' conduct has had, and continues to have, a direct, substantial and reasonably foreseeable effect on both interstate commerce and on intrastate commerce in each Class state, including commerce in this District and state, and it will continue to do so if not constrained by the Court.

## FACTUAL ALLEGATIONS

### Generic Drugs and the Pharmaceutical Industry

35.     Defendants manufacture and sell, *inter alia*, generic versions of branded drugs once any applicable patent on the branded drugs expires.

36.     Generic drugs are "the same as a brand name drug in dosage, safety, strength, how it is taken, quality, performance, and intended use."[7] If the FDA approves a generic drug as "therapeutically equivalent" to a brand drug, the generic version "can be expected to have equal effect and no difference when substituted for the brand name product."[8] Generics in mature markets often cost as little as 10-15% of the branded drug's price.[9]

37.     Studies have shown that generic drugs' entrance onto the market can quickly erode a branded drug's market share – often 90% of the branded drug's sales. Per IMS Health data, generic drugs as of 2013 account for 86% of all drugs dispensed in the United States.[10]

---

[7] http://www.fda.gov/Drugs/InformationOnDrugs/ucm079436.htm#G.
[8] *Id.*
[9] FTC Staff Study, PAY-FOR-DELAY: HOW DRUG COMPANY PAY-OFFS COST CONSUMERS BILLIONS, at 8 (Jan. 2010), *available at* http://emmanuelcombe.org/delay.pdf.
[10] IMS Institute for Healthcare Informatics, Medicine use and shifting costs of healthcare: A review of the use of medicines in the United States in 2013 (Apr. 2014), at 51, http://www.plannedparenthoodadvocate.org/2014/IIHI_US_Use_of_Meds_for_2013.pdf.



38.     The more generic versions of a drug are available on the market, the lower the prices that consumers and third-party payors have to pay. Each successive generic product in a competitive market lowers the price because each entry increases competition for sales and market share.  In a competitive market, both the branded manufacturer and the older generic manufacturers lower prices in response to the new competitor, as the following FDA chart shows[11]:

---

[11] FDA, Generic Competition and Drug Prices,
http://www.fda.gov/AboutFDA/CentersOffices/OfficeofMedicalProductsandTobacco/CDER/uc m129385.htm.



**Generic Competition and Drug Prices**

Source: FDA analysis of retail sales data from IMS Health, IMS National Sales
Perspective (TM), 1999-2004, extracted February 2005

39.    Accordingly, generic competition to a branded drug can provide billions of dollars in savings to consumers, pharmacies, other purchasers, private health insurers, health and welfare funds and state Medicaid programs, which reimburse drug purchases for their insureds. A GPhA study found that generic drugs saved the U.S. healthcare system $1.68 trillion between 2005 and 2014, including $254 billion in 2014 alone.[12]

40.    The great benefits of generic competition were recognized by Congress and memorialized with the enactment of the Drug Price and Patent Term Restoration Act of 1984, (the "Hatch-Waxman Act").  The Hatch-Waxman Act simplifies and sets out the regulatory hurdles with which generic drug manufacturers have to comply prior to marketing and selling generic drugs.  For example, rather than having to file a lengthy New Drug Application ("NDA"), the Hatch-Waxman Act provides for a generic drug manufacturer to file an Abbreviated New Drug Application ("ANDA") in order to obtain FDA approval.

---

[12] Generic Pharmaceutical Association, *Generic Drug Savings in the U.S.*, at 1 (2015), http://www.GPhAonline.org/media/wysiwyg/PDF/GPhA_Savings_Report_2015.pdf.

41.     An ANDA applicant must show that its generic drug is bioequivalent to the brand drug, and the ANDA applicant can rely on the scientific and clinical data compiled by the Brand's NDA, including safety and efficacy data.  This reliance allows the generic company to forego duplicative and expensive experimentation and having to perform its own clinical trials.

42.     During the approval process, the FDA will assign a "Therapeutic Equivalence Code" ranging from "AA" to "BX."  An "AB" rating signifies that the approved generic drug is therapeutically equivalent to its branded counterpart.

43.     Due to the price differentials between branded and generic drugs, as well as other institutional features of the pharmaceutical industry, pharmacists liberally (and sometimes are legally required to) substitute a generic drug when consumers fill prescriptions for a branded drug. Since passage of the Hatch-Waxman Act, every state has adopted substitution laws requiring or permitting pharmacies to substitute generic drug equivalents (AB rated) for branded drug prescriptions (unless the prescribing physician specifically orders otherwise by writing "dispense as written" or similar language on the prescription).

### Market for Generic Levothyroxine

44.     The market for generic Levothyroxine is mature.  Defendants must compete on price in order to gain market share.

45.     Levothyroxine is widely prescribed to replace or provide more thyroid hormone than what is normally produced by a healthy thyroid.  Thyroid hormone is important "for maintaining normal mental and physical activity."[13]  It is also critical in children "for normal mental and physical development."[14]

---

[13] http://www.webmd.com/drugs/2/drug-1433/levothyroxine-oral/details
[14] *Id.*

46.     Levothyroxine is available in several dosage levels.  Physicians are able to adjust dosages in order to obtain optimal hormone levels in their patients.  This adjustment period occurs during the first few months when a patient starts on Levothyroxine.   Many patients will stay on Levothyroxine their entire lives.

47.     The branded versions of Levothyroxine are sold under the trade names Synthroid®, Levoxyl®, Levothroid®, and Unithroid®.   Generic Levothyroxine is bioequivalent to these products.

48.     Collectively, Defendants sell hundreds of millions of dollars of generic Levothyroxine each year.

### Pricing of Levothyroxine Inexplicably Rises

49.     In 2012, the Centers for Medicare and Medicaid Services commissioned a company called Myers and Stauffer to take surveys of pharmacies across the U.S. to determine the average price of prescription drugs.  The National Average Drug Acquisition Cost ("NADAC") is a master list which is updated and published weekly.  This list calculates the cost per pill that drug manufacturers charge for their medications and is based on the average actual acquisition costs for retail pharmacies across the United States.

50.     Between February 2013 and December 2015, the price of each strength of Levothyroxine increased significantly as demonstrated by the following charts:























51.     The largest increases for each dosage occurred in late 2013 and again in late 2014. That trend has continued through the end of 2016 with prices of Levothyroxine remaining at levels approximately 200% to 300% higher than late 2012 levels.

52.     Without changes in the market or supply shortages, competition in the market for generic Levothyroxine should have remained at pre-Class Period levels.  This sudden unexplained and sustained price increase can be reasonably inferred to be caused by anticompetitive behavior by the generic manufacturers, *i.e.*, illegal collusion among the generic manufacturers to fix, raise, maintain or stabilize the price of generic Levothyroxine.

53.     Defendants' pricing conduct smacks of collusion, as multiple competitors at multiple times for multiple products have engaged in mirror-image price raises to untenable and anticompetitive levels, to the great detriment of the purchasing public.

54.     As illustrated in the charts above, prices for these generic drugs had been both stable and low for years prior to Defendants' huge increases.

55.     During an earnings call with analysts on September 10, 2013, Mr. Bedrosian, CEO of Lannett, was asked for his thoughts on Mylan's significant price increase for Levothyroxine. Mr. Bedrosian replied, "You mean after I sent them the thank you note?"  Adding: "So whenever people start acting responsibly and raise prices as opposed to the typical spiral down of generic drug prices, I'm grateful.  Because Lannett tends to be active in raising price …. So I'm grateful to see price increases."  During the same call, Mr. Bedrosian identified two potential competitors that could enter the Levothyroxine market and stated, "But hopefully, both companies turn out to be responsible companies and don't go into the marketplace. We're seeing more responsibility on the part of all of our competitors, I believe, because all of us are facing the same costs. . . . So I would expect that all the companies are not going to behave like they have in the past. And I suspect you're going to see more price increases in the generic marketplace or certainly less price erosion in the marketplace because of that."

56.     In later earnings calls held with analysts on November 7, 2013 and February 6, 2014 Mr. Bedrosian noted that "price increases on key products" including Levothyroxine were among "[t]he primary drivers" for their outstanding performance.  Adding during the November call, "these price increases that are going on in the industry, **I think they're going to stick for all companies**."

57.     During an earnings call with analysts on May 7, 2014, Mr. Bedrosian again announced outstanding financial results, marked by a "50% increase on Levo" for that quarter and confirmed that the price for Levothyroxine would be kept "at 75% of the brand [drugs price] with this new increase."

58.     During an earnings call with analysts on August 27, 2014, Mr. Bedrosian confirmed that Lannett did not anticipate any new competition for Levothyroxine.  Noting, "we did know [of] one case, a company in Europe that indicated they were going to get an approval and they reached out to a competitor to distribute it to them but we know that, that competitor turned them down. When we called them, they denied they even were working on a product.

59.     During an earnings call with analysts on November 3, 2014, Mr. Bedrosian stated, "Mylan is one of those rational competitors, so we're not really expecting anything crazy from them."  He characterized price increases as a "rocket ship [that] is leveling off not that it's broken through the atmosphere."

60.     During an earnings call with analysts on February 14, 2015, Mr. Bedrosian shared his view on the future of the generic drug industry:

> We don't see that kind of behavior sustainable [referring to earlier price wars], and we don't see it going further into the future.  I think you're going to find more capital pricing, more – I'll say less competition, in a sense.  You won't have price wars … . I just don't see the prices eroding like they did in the past.

61.     During an earnings call with analysts on August 25, 2015, Mr. Bedrosian stated in
reference to pricing:

> [E]verybody keeps bringing up the sustainability of price increases.  Well, they
> seem to be sustainable.  I'm not saying that there hasn't been some weakness here
> and there, but overall, I feel the price increases have been sustainable and we're
> going into almost the third year now with some of these increases.  So we think it's
> a more rational market we're in.

62.     During an earnings call with analysts on February 3, 2016, Mr. Galvin, Lannett's
CFO touted Levothyroxine's sales noting, "[l]evothyroxine is our largest product.  The gross
margin on the product[,] it's above 50%."

63.     During an earnings call with analysts on August 23, 2016, Mr. Bedrosian stated that
"net sales of $45.9 million" for Lannett's Levothyroxine, which was "a record for that category."
When asked about the absence of price discounts by new entrants in the generic drug industry,
Bedrosian responded:

> So price usually doesn't get you to results you want.  So, I think a lot of people
> have learned that lesson by now.  But some of the dumber newer companies
> continue to go down that path, because they haven't figured it out yet for
> themselves.  But I do see occasional situations like that, but not a lot.

Mr. Bedrosian went on to applaud competitors that do not cave to price discounting, which:

> [I]n itself moderates some of the crazy behaviors that are occurring when some
> countries decided to enter the U.S. market and grab market share.  As a result, I've
> seen those people have been maturing in the market in realizing they need to make
> it profit as well in the United States.

64.     Mylan shares Lannett's view of the forgoing "rational" price competition behavior.
Mylan's CEO Heather Bresch stated, during a May 2, 2013 earnings call, that earlier price
competition was "chasing the floor" and suggested that Mylan would raise prices.  Adding:

> I think that there was very whacked-out prices, dirt cheap, literally cheaper than dirt
> for some of those older products.  And the bar needs to go.  It needed to go up from
> a quality perspective, and it needs to go up and get rebalanced from a pricing
> perspective.  So I think that we have certainly seen that.  And I'm not – there's

extremes on both ends. But I think, overall, the bar is going up. And so that stability and that tide will go with it. And so I see that staying, because I think people realized the detriment it did to this therapeutic category by having the dynamics in pace that were.

### Government Investigations

65.      During approximately this same period of time that Levothyroxine increased, prices for a number of other generic drugs also increased dramatically. For example, the price of a generic antibiotic, doxycycline rose 8,281% between October 2013 and April 2014.[15]

66.      Due to the huge increase in this and other generic prices, Congress and state governments each began inquiries into numerous generic drug manufacturers' actions. The pricing data and other evidence resulted from these investigations.

67.      The inquiries requested the companies to provide documents and information from 2012 to the present, including total gross revenues from the sales of the drugs in question; the date, quantities, purchasers and prices paid for all sales of the drugs; total expenses relating to the sales of the drugs, as well as the specific amounts for manufacturing, marketing and advertising, and purchases of active pharmaceutical ingredients ("API"), if applicable; sales contracts or purchase agreements for API for the drugs, including any agreements relating to exclusivity, if applicable; a description and valuation of the specific financial and non-financial factors that contributed to the various companies' decisions to increase the prices of the drugs; any cost estimates, project projections, or other analyses relating to the companies' current and future sales of the drugs; prices of the drugs in all foreign countries or markets, including price information for the countries

---

[15] http://www.sanders.senate.gov/newsroom/press-releases/congress-investigating-why-generic-drug-prices-are-skyrocketing.

paying the highest and lowest prices; and the identity of official(s) responsible at each company for setting the prices of these drugs over the above time period.[16]

68.    Congressman Sanders and Cummings held a hearing in November 2014 to discuss the drugs that had recently spiked in price, putting a drain on consumers' budgets.

69.    After Sen. Sanders' held a Senate hearing, on February 24, 2015, Rep. Cummings and Sen. Sanders wrote to the U.S. Department of Health & Human Services' Office of the Inspector General ("OIG"). They asked OIG to investigate how Defendants' price increases affected spending in the Medicare and Medicaid programming.[17]   OIG accordingly began to review quarterly average manufacturer prices for the top 200 generic drugs from 2005 to 2014.[18]

70.    On the state level, Connecticut attorney general George Jepsen issued subpoenas to numerous generic manufacturers in July 2014, on the basis that there was reason to believe that generic manufacturers engaged in a conspiracy which "has the effect of, (a) fixing, controlling or maintaining prices, rates, quotations, or fees; or (b) allocating or dividing customers or territories…"[19]

71.    The DOJ also launched a probe into alleged price-fixing among generic manufacturers. In November 2014, the DOJ issued grand jury subpoenas to many generic manufacturers requesting documents, information, and testimony relating to "communication or correspondence with any competitor in the sale of generic prescription medications." Impax

---

[16] *Id*. at 3.

[17] http://www.sanders.senate.gov/download/sanders-cummings-letter?inline=file.

[18] http://www.sanders.senate.gov/download/oig-letter-to-sen-sanders-4-13-2015?inline=file.

[19] Impax Laboratories (IPXL) Receives Subpoena from Connecticut AG, http://www.streetinsider.com/Corporate+News/Impax+Laboratories+(IPXL)+Receives+Subpoena+from+Connecticut+AG/9662945.html.

Laboratories, Inc. was the first to disclose having received a subpoena.[20]  Additional subpoenas were issued in May 2016, and there may be additional ones issued.

72.     On December 12, 2016, the DOJ filed criminal informations against Glazer and Malek, the respective former Chief Executive Officer and President of Heritage Pharmaceutical, Inc.  These informations accused Malek and Glazer of conspiring to "knowingly enter[] into and engag[ing] in a combination and conspiracy other persons and entities engaged in the production and sale of generic pharmaceutical products, including doxycycline hyclate, the primary purpose of which was to allocate customers, rig bids, and fix and maintain prices of doxycycline hyclate sold in the United States."[21]

73.     A press release issued by DOJ in conjunction with these filings stated:

> "Millions of Americans rely on prescription medications to treat acute and chronic health conditions.  By entering into unlawful agreements to fix prices and allocate customers, these two executives sought to enrich themselves at the expense of sick and vulnerable individuals who rely upon access to generic pharmaceuticals as a more affordable alternative to brand-name medicines," said Deputy Assistant Attorney General Brent Snyder of the Justice Department's Antitrust Division.  "These charges are an important step in correcting that injustice and in ensuring that generic pharmaceutical companies compete vigorously to provide these essential products at a price set by the market, not by collusion."

> "Conspiring to fix prices on widely-used generic medications skews the market, flouts common decency – and very clearly breaks the law," said Special Agent in Charge Michael Harpster of the FBI's Philadelphia Division.  "It's a sad state of affairs when these pharmaceutical executives are determined to further pad their profits on the backs of people whose health depends on the company's drugs.  The FBI stands ready to investigate and hold accountable those who willfully violate federal antitrust law."

---

[20] Impax Laboratories, Inc. Current Report (Form 8-K) (November 3, 2014).

[21] "Information," p. 2 (December 12, 2016) (ECF No. 1) in *United States v. Glazer*, No. 2:16-cr-00506-RBS (E.D. Pa.); "Information," p. 2 (December 12, 2016) (ECF No. 1) in *United States v. Malek*, No. 2:16-cr-00508-RBS (E.D. Pa.).

> Today's charges are the result of an ongoing federal antitrust investigation into price fixing, bid rigging and other anticompetitive conduct in the generic pharmaceutical industry, which is being conducted by the Antitrust Division's Washington Criminal I Section with the assistance of the FBI's Philadelphia Division, the FBI headquarters' International Corruption Unit, the United States Postal Service Office of Inspector General and the U.S. Attorney's Office for the Eastern District of Pennsylvania.[22]

74.    On December 14, 2016, the attorneys general ("AG") of twenty states filed a complaint against multiple generic manufacturers of doxycycline hyclate for conspiring to fix the prices and allocate the market for this medication.[23]

75.    Significantly, both the DOJ press release as well as the AG Complaint indicate that these actions by the generic manufacturers of doxycycline hyclate were not isolated and limited to doxycycline hyclate.   The AG Complaint mentions a "wide-ranging series of conspiracies implicating numerous different drugs and competitors."[24]

### Collusion in the Generic Drug Market

76.    The United States generic Levothyroxine market displays various qualities that place it at risk of collusion and other anticompetitive behavior. Such qualities include: (1) high concentration; (2) high barriers to entry; (3) inelasticity of demand; (4) lack of available product substitutes; and (5) opportunities to conspire.

### Concentration in the Market.

77.    Concentration in a market for goods creates susceptibility for collusion and other anticompetitive conduct. The market for Levothyroxine is highly concentrated. Defendants each

---

[22] https://www.justice.gov/opa/pr/former-top-generic-pharmaceutical-executives-charged-price-fixing-bid-rigging-and-customer.
[23] *State of Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-2056 VLB (D. Conn.)
[24] *Id*. at ¶9.

possess large market shares in their respective markets. Only a handful of competitors exist in each market.

78.     The Levothyroxine market is highly concentrated and is dominated by Defendants: Lannett with approximately 30% of the market and Mylan with approximately 68% of the market.

79.     The limited number of manufacturers in this market facilitated Defendants' ability to coordinate prices of their generic drugs.

80.     The market for Levothyroxine is mature and Defendants can only compete on price in order to gain market share.

**High Barriers to Entry.**

81.     Typically, markets for goods that have high prices attract new competitors who can undercut competition by offering lower prices to the consuming public, thus mitigating effects of collusion. However, when a market has high barriers to entry, new competitors are less likely to enter the market. Accordingly, high barriers to entry facilitate collusive behavior.

82.     The market for generic Levothyroxine has high barriers to entry, including regulatory, intellectual property and financial hurdles.

83.     All generic drug manufacturers must receive FDA approval prior to marketing and selling products. FDA approval requires, *inter alia*, the preparation and filing of an ANDA, which typically costs at least $1 million.[25]

84.     Further, both state and federal law govern the operation of drug manufacturing facilities. Such costs of doing business are another regulatory barrier to entry for potential competitors.

---

[25] Testimony of Dr. Scott Gottlieb, Hearing on "Why Are Some Generic Drugs Skyrocketing in Price?" (Nov. 20, 2014), available at https://www.aei.org/wp-content/uploads/2014/11/Gottlieb-Generic-Drug-Testimony-112014.pdf, at 7.

85.    Intellectual property costs can include acquisition of, and litigation over, patent rights, either through the investigation of whether a drug compound is protected by a valid patent or for establishment of preferred generic treatment under the Hatch-Waxman Act. Transactional costs such as licensing deals can add further layers of costs.

86.    Finally, generic drug makers also incur large research and development costs, high labor costs to retain employees with specialized skills and knowledge as well as professional certifications suitable for the work required, significant capital outlay for sufficient real estate and equipment, and other corporate financial requirements inherent to the pharmaceutical industry.

87.    The small number of competitors in the generic Levothyroxine market reflects these high barriers to entry.   In fact, no competitor has entered the Levothyroxine market since Defendants began marketing and selling generic Levothyroxine in 2004.

**Inelastic Demand.**

88.    In economics, elasticity of demand is the sensitivity of supply and demand to changes in one or the other.   Price elasticity is defined as the measure of how much the quantity demanded will change if price, a separate factor, changes. When price elasticity of demand is inelastic, prices increase because there will only be a small decrease in demand relative to the price increase, such that the increases make up for the decreases. Accordingly, total revenues rise in a market with price inelasticity of demand, even if raw sales figures go down.

89.    Perfectly inelastic demand occurs when consumers would pay anything for a good, such as food or water, which is necessary for survival.   Colluding entities can profit handsomely from goods that have nearly perfectly inelastic demand because they can charge whatever they wish knowing, first, that consumers will pay whatever price is charged, and second, that the collusion blocks any kind of competition that should serve to lower prices in that market.

90.     Accordingly, Defendants have been able to reap materially significant profits as a result of attacking the integrity of the market for generic Levothyroxine, as the market for the drug displays a price inelasticity of demand.

### Lack of Available Product Substitutes.

91.     Patients that require the use of Levothyroxine, do so because they are unable to naturally produce enough thyroid hormone.   These individuals must take either brand name Levothyroxine products or generic alternatives.   Historically the brand name alternatives cost more than generic alternative, even at artificially inflated levels.

### Opportunities to Conspire.

92.     Defendants' collusive scheme works because each Defendant has constant and continuous opportunities to meet rather than to compete. All Defendants participate in some capacity in GPhA, a leading trade association for generic drug manufacturers and distributors. Current "Regular Members" of GPhA includes Defendant Mylan. "Regular Members" are "corporations, partnerships or other legal entities whose primary U.S. business derives the majority of its revenues from sales of (1) finished dose drugs approved via ANDAs; (2) products sold as authorized generic drugs; (3) biosimilar/biogeneric products; or (4) DESI products."[26]  Lannett has been present at GPhA meetings before and during the Class Period.

93.     Additionally, Defendants attend industry trade shows and conferences which provide Defendants' representatives the opportunity to interact with each other directly, and discuss their respective businesses and customers.  Recreational and social events at these conferences, such as golf outings, lunches, cocktail parties, dinners, and other activities at these trade shows and conferences provide additional opportunities for conspirators to meet with

---

[26] GPhA, Membership, http://www.gphaonline.org/about/membership.

competitors away from the usual business setting. Defendants' representatives use these functions to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers, among other competitively-sensitive information.

94.     Moreover, the DOJ's grand jury subpoenas and informations also indicate that communication between Defendants was prevalent. The DOJ has stated that "prosecutors are taking a close look at trade associations as part of their investigation as having been one potential avenue for facilitating the collusion between salespeople at different generic producers."[27]

## ANTITRUST EFFECTS AND VIOLATIONS

95.     During the Class Period, Plaintiff and Damages Class Members purchased substantial amounts of Levothyroxine tablets indirectly from Defendants. Because of Defendants' illegal conduct set forth herein, the End-Payor purchasers have paid, and are still paying, artificially and substantially inflated prices for Levothyroxine.

96.     Plaintiff and Damages Class Members have sustained substantial losses and resultant damage to their business and property in the form of overcharges. These losses and damages will continue to accrue until the anticompetitive conduct set forth herein ceases. The full amount of such damages will be determined at trial.

97.     These losses are caused directly by Defendants' anticompetitive conduct, which had at least the following effects:

        a.     Price competition in the market for generic Levothyroxine has been artificially restrained, suppressed or eliminated in the United States;

---

[27] http://www.mergermarket.com/pdf/DoJ-Collusion-Generic-Drug-Prices-2015.pdf.

b.      Prices for generic Levothyroxine sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and supracompetitive levels; and

c.      Purchasers of generic Levothyroxine from Defendants have been deprived of the benefit of free and open competition in the market for generic Levothyroxine.

98.     At all relevant times, Defendants sold Levothyroxine within the continuous and uninterrupted flow of interstate commerce. Defendants transmitted invoices, contracts, funds and other forms of business communication throughout this time.

99.     The pricing and regulation in the generic drugs industry means that overcharges at higher levels of the distribution chain get passed down to end-payors such as Plaintiff and Damages Class Members. Wholesalers and retailers who incurred higher charges for Levothyroxine due to Defendants' behavior simply passed on those charges to the indirect purchasers.

100.    During the Class Period, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain or stabilize the prices of generic drugs in the United States.

101.    In forming, effectuating and operating the contract, combination or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain, and/or stabilize the price of generic Levothyroxine sold in the United States. These activities include the following:

a.      Defendants met in person or telephonically to discuss the price of generic Levothyroxine in the United States;

b.      Defendants agreed during those meetings and conversations to charge set prices and otherwise to increase or maintain prices of generic Levothyroxine sold in the United States;

      c.      Defendants agreed during those meetings and conversations to fix the price of generic Levothyroxine;

      d.      Defendants issued price announcements in accordance with their agreements; and

      e.      Defendants actually set prices in accordance with their agreements.

102.    Defendants' anticompetitive behavior allowed them to charge the purchasing public prices higher than what they would have been able to charge otherwise.

103.    Inflated prices for consumers purchasing Levothyroxine were a direct, traceable and foreseeable result of Defendants' conspiracy.

104.    Plaintiff and Damages Class Members purchased generic Levothyroxine from Defendants or their affiliates or co-conspirators at inflated, supracompetitive prices during the period of the conspiracy.

105.    Defendants' contract, combination or conspiracy constitutes an unreasonable restraint of interstate trade and commerce in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3, and the laws of various states.

106.    But for Defendants' anticompetitive conduct, Plaintiff and Damages Class Members would not have paid these inflated prices. Accordingly, Plaintiff and Damages Class Members have been injured in their business and property in that they paid more for generic Levothyroxine than they would have paid in a competitive market.

## CLASS ALLEGATIONS

107.    Plaintiff brings this action on behalf of itself and as a class action under Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

All persons and entities in the United States and its territories who purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic Levothyroxine products during the Class Period, which runs from February 1, 2013, through the present or the date on which the anticompetitive effects subside.

This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, or municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic Levothyroxine products for purposes of resale or directly from Defendants; (d) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Levothyroxine products were paid in part by a third party payor and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit managers and (g) any judges or justices involved in this action and any members of their immediate families.

108.   Plaintiff also brings this action on behalf of itself and as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition and consumer protection laws of the states listed below (the "Indirect Purchaser States")[28] on behalf of the following class (the "Damages Class"):

All persons and entities in the Indirect Purchaser States who purchased, paid and/or provided reimbursement for some or all of the purchase price for Defendants' generic Levothyroxine products during the Class Period, which runs from February 1, 2013, through the present or the date on which the anticompetitive effects subside.

This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, or

---

[28] The "Indirect Purchaser States" are Alabama, Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia and Wisconsin.

municipalities with self-funded prescription drug plans; (c) all persons or entities who purchased Defendants' generic Levothyroxine products for purposes of resale or directly from Defendants; (d) fully insured health plans (i.e., health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Defendants' generic Levothyroxine products were paid in part by a third party payor and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit managers; and (g) any judges or justices involved in this action and any members of their immediate families.

109.    The Nationwide Class and the Damages Class are herein referred to as the "Classes." Members of each Class may be referred to as "Class Members."

110.    The Classes are each individually sufficiently numerous. Plaintiff believes there are hundreds of thousands, if not millions, of members in each Class, in an amount to be determined in discovery and at trial. The identities of Class Members will be readily ascertainable through business records kept in regular order.

111.    Common questions of law and fact exist as to all Class Members. The effects of Defendants' conspiracy were generally applicable to all Class Members, thereby making relief appropriate with respect to the Classes as a whole. Such questions of law and fact common to the Classes include but are not limited to:

a.    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize prices of generic Levothyroxine;

b.    Whether Defendants and their co-conspirators allocated markets for customers for generic Levothyroxine sold in the United States;

c.    Whether Defendants' conduct harmed competition in the market for generic Levothyroxine;

d.    Whether Defendants' conduct has substantially affected interstate and intrastate commerce;

e.    Whether, and to what extent, Defendants' conduct caused and/or is causing antitrust injury to the business or property of Plaintiff and

Damages Class Members in the nature of overcharges;

f.      The quantum of overcharges paid by Plaintiff and Damages Class Members;

g.      The participants in the alleged conspiracy;

h.      The duration of the alleged conspiracy;

i.      The acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

j.      Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Claim for Relief;

k.      Whether the alleged conspiracy violated state antitrust and unfair competition laws, and/or state consumer protection laws, as alleged in the Second Claim for Relief;

l.      Whether the Defendants unjustly enriched themselves to the detriment of the Plaintiff and the Class Members, thereby entitling Plaintiff and the Class Members to disgorgement of all benefits derived by Defendants, as alleged in the Third Claim for Relief;

m.      Whether the conduct of the Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the Class Members;

n.      The effect of the alleged conspiracy on the prices of generic Levothyroxine sold in the United States during the Class Period;

o.      The appropriate injunctive and related equitable relief for the Nationwide Class; and

p.      The appropriate class-wide measure of damages for the Damages Class.

112.    Plaintiff's claims are typical of the claims of the Class Members. Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff and all Class Members are all affected by Defendants' wrongful conduct in the same way, in that they paid artificially inflated prices for generic Levothyroxine purchased indirectly from the Defendants and/or their co-conspirators.

113.    Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other Class Members. Plaintiff's interests coincide with, and are not antagonistic to,

those of the other Class Members. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

114.    The questions of law and fact common to Class Members predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

115.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons or entities located throughout the United States to prosecute common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would require. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining relief for claims that could not practicably be pursued individually, substantially outweigh any difficulties that may arise in management of this class action.

116.    The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

### FIRST CLAIM FOR RELIEF
**Violation of Sections 1 and 3 of the Sherman Act**
**(on behalf of Plaintiff and the Nationwide Class)**

117.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

118.    Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade, in violation of Section 1 and Section 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

119.    The acts done by each Defendant as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

120.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to establish a price floor and artificially fix, raise, stabilize, and control prices for generic Levothyroxine, thereby creating anticompetitive effects in the markets therefor.

121.    Defendants' acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for generic Levothyroxine.

122.    As a result of Defendants' unlawful conduct, Plaintiff and other similarly situated indirect purchasers in the Nationwide Class who purchased generic Levothyroxine have been harmed by being forced to pay inflated, supracompetitive prices for generic Levothyroxine.

123.    In formulating and carrying out the alleged agreement, understanding, contract, combination and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

124.    Defendants' conspiracy had the following effects, among others:

a.    Price competition in the market for generic Levothyroxine has been artificially restrained, suppressed or eliminated in the United States;

b.    Defendants' prices for generic Levothyroxine have been raised, fixed, maintained, or stabilized at artificially high and supracompetitive levels; and

c.    Purchasers of generic Levothyroxine from Defendants have been deprived of the benefit of free and open competition in the market for generic Levothyroxine.

125.    Plaintiff and members of the Nationwide Class have been and will continue to be injured in their business and property by paying more for generic Levothyroxine purchased indirectly from Defendants and the co-conspirators than they would have paid and will pay in the absence of the conspiracy.

126.    The alleged contract, combination or conspiracy violates the federal antitrust laws, including the Sherman Act.

127.    Plaintiff and members of the Nationwide Class are entitled to injunctive relief, preventing and restraining Defendants from committing the violations alleged herein.

**SECOND CLAIM FOR RELIEF**
**Violation of State Antitrust Statutes**
**(on behalf of Plaintiff and the Damages Class)**

128.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

129.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of generic Levothyroxine in unreasonable restraint of trade and commerce, in violation of the various state antitrust and consumer protection statutes set forth below.

130.    The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, inflate, stabilize, and/or maintain at artificially supracompetitive prices for generic Levothyroxine and to allocate customers for generic Levothyroxine in the United States.

131.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the combination and conspiracy, including: (a) participating in meetings and conversations among themselves in the United States during which they agreed to price generic Levothyroxine at specified levels, and otherwise to fix, increase,

maintain, or stabilize effective prices paid by Plaintiff and members of the Damages Class with respect to generic Levothyroxine provided in the United States; and (b) participating in meetings and conversations among themselves in the United States to implement, adhere to, and enforce their unlawful agreements.

132.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize prices of generic Levothyroxine.

133.    Defendants' knowingly and willfully carried out the anticompetitive acts described above. There was and is no legitimate, non-pretextual, procompetitive business justification for Defendants' contract, conspiracy or combination that outweighs its harmful effects. Accordingly, these acts constitute violations or flagrant violations of the antitrust laws of various states.

134.    Alternatively, during at least the Class Period, there has been a gross disparity between the price that Plaintiff and Damages Class Members paid for generic Levothyroxine compared to what they would have paid under competitive market conditions, which should and would have been present but for Defendants' unlawful and inequitable conduct.

135.    Said disparity was a direct and proximate result of Defendants' anticompetitive, deceptive, unfair, unconscionable, and fraudulent conduct, from which Plaintiff and Damages Class Members were deprived of the opportunity to purchase competitively priced Levothyroxine from Defendants and were forced to pay higher prices for generic Levothyroxine than they otherwise would have paid.

136.    Accordingly, Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of various state antitrust and/or consumer protection statutes.

137.    By engaging the foregoing conduct, Defendants have threatened the business or property of Plaintiff and thus violated the antitrust laws of various states, and/or they have participated in unfair competition or unfair or deceptive acts or practices in violation of state unfair and deceptive trade practices and consumer protection statutes of various states, both of which are listed herein:

a.    Ala. Code §§ 8-10-1 and 6-5-60(a), with respect to purchases in Alabama by Damages Class Members;

b.    Ariz. Rev. Stat. 44-1401, *et seq.*, with respect to purchases in Arizona Damages Class Members;

c.    Cal. Bus. & Prof. Code § 16700 *et seq.*, with respect to purchases in California by Damages Class Members;

d.    D.C. Code § 28-4501 *et seq.*, with respect to purchases in the District of Columbia by Damages Class Members;

e.    Fla. Stat. §§ 501.201, *et seq.*, with respect to purchases in Florida by Damages Class Members;

f.    Haw. Rev. Stat. § 480 *et seq.*, with respect to purchases in Hawaii by Damages Class Members;

g.    Iowa Code § 553 *et seq.*, with respect to purchases in Iowa Damages Class Members;

h.    Kan. Stat. Ann. § 50-101 *et seq.*, with respect to purchases in Kansas by Damages Class Members;

i.    Me. Rev. Stat. Ann. Tit. 10, § 1101 *et seq.*, with respect to purchases in Maine by Damages Class Members;

j.    Mich. Comp. Laws § 445.772 *et seq.*, with respect to purchases in Michigan by Damages Class Members;

k.    Minn. Stat. § 325D.49 *et seq.*, with respect to purchases in Minnesota by Damages Class Members;

l.    Miss. Code Ann. § 75-21-1(a) *et seq.*, with respect to purchases in Mississippi by Damages Class Members;

m.     Mo. Rev. Stat. § 407.020, *et seq.*, with respect to purchases in Missouri by Damages Class Members;

n.     Neb. Rev. Stat. § 59-801 *et seq.*, with respect to purchases in Nebraska by Damages Class Members;

o.     Nev. Rev. Stat. Ann. § 598A *et seq.*, with respect to purchases in Nevada by Damages Class Members, in that at least thousands of sales of Defendants' PSPs took place in Nevada, purchased by Nevada consumers at supracompetitive prices caused by Defendants' conduct;

p.     N.H. Rev. Stat. Ann. § 356:1 *et seq.*, with respect to purchases in New Hampshire by Damages Class Members;

q.     N.M. Stat. Ann. § 57-1-1 *et seq.*, with respect to purchases in New Mexico by members of the Class;

r.     N.Y. Gen. Bus. Law § 340 *et seq.*, with respect to purchases in New York by Damages Class Members;

s.     N.D. Cent. Code § 51-08.1-01 *et seq.* with respect to purchases in North Dakota by Damages Class Members;

t.     Or. Rev. Stat. § 646.705 *et seq.*, with respect to purchases in Oregon by Damages Class Members;

u.     73 P.S. 201-1, *et seq.*, with respect to purchases in Pennsylvania by Damages Class Members;

v.     R.I. Gen. Laws § 6-36-11(a), with respect to purchases in Rhode Island by Damages Class Members;

w.     S.D. Codified Laws § 37-1 *et seq.*, with respect to purchases in South Dakota by Damages Class Members;

x.     Utah Code Ann. § 76-10-3101 *et seq.*, with respect to purchases in Utah by Damages Class Members who are either Utah residents or Utah citizens;

y.     Vt. Stat. Ann. Tit. 9, § 2453, *et seq.*, with respect to purchases in Vermont by Damages Class Members; and

z.     Wis. Stat. § 133.01 *et seq.*, with respect to purchases in Wisconsin by Damages Class Members, in that the actions alleged herein substantially affected the people of Wisconsin, with at least thousands of consumers in

Wisconsin paying substantially higher prices for generic digoxin and/or doxycycline in Wisconsin.

<u>**THIRD CLAIM FOR RELIEF**</u>
**Unjust Enrichment**
**(on behalf of Plaintiff and the Damages Class)**

138.    Plaintiff repeats the allegations set forth above as if fully set forth herein.

139.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

140.    As a result of their unlawful conduct described above, Defendants have and will continue to be unjustly enriched. Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits on generic Levothyroxine.

141.    Defendants' financial benefits are traceable to Plaintiff's and Damages Class Members' overpayments for generic Levothyroxine.

142.    Plaintiff and Damages Class Members have conferred and continue to confer an economic benefit upon Defendants in the nature of profits resulting from the unlawful overcharges described herein, to the economic detriment of Plaintiff and Damages Class Members.

143.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of the ill-gotten gains resulting from the overpayments made by Plaintiff and the members of the Damages Class for generic Levothyroxine manufactured by Defendants during the Class Period.

144.    It would be futile for Plaintiff and Damages Class Members to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased generic Levothyroxine, as those intermediaries are not liable and would not compensate Plaintiff and Damages Class Members for Defendants' unlawful conduct.

145.    The economic benefit Defendants derived from overcharging Plaintiff and Damages Class Members for generic Levothyroxine is a direct and proximate result of Defendants' unlawful and anticompetitive practices.

146.    The financial benefits Defendants derived are ill-gotten gains that rightfully belong to Plaintiff and Damages Class Members, who paid and continue to pay artificially inflated prices that inured to Defendants' benefit.

147.    It would be inequitable under unjust enrichment principles under the laws of each state in the United States as well as the District of Columbia for Defendants to retain any of the overcharges Plaintiff and Damages Class Members paid for generic Levothyroxine that were derived from Defendants' unfair, anticompetitive and unlawful methods, acts and trade practices.

148.    Defendants are aware of and appreciate the benefits that Plaintiff and the Damages Class Members have bestowed upon them.

149.    Defendants should be ordered to disgorge all unlawful or inequitable proceeds they received in a common fund for the benefit of Plaintiff and Damages Class Members, who collectively have no adequate remedy at law.

150.    Plaintiff and Damages Class Members are entitled to the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust, and inequitable conduct, and to the establishment of a constructive trust consisting of such amount, from which Plaintiff and Damages Class Members may make claims on a *pro rata* basis.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the proposed Classes demands judgment that:

A.      The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

B.      That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed: (a) an unreasonable restraint of trade or commerce in violation of Sections 1 and 3 of the Sherman Act; (b) a *per se* violation of Sections 1 and 3 of the Sherman Act; (c) an unlawful combination, trust, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (d) acts of unjust enrichment by Defendants as set forth herein;

C.      Plaintiff and Damages Class Members recover damages, to the maximum extent allowed under such laws, and that joint and several liability be found to accrue against Defendants in an amount to be trebled to the extent such laws permit;

D.      Plaintiff and Damages Class Members recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully gained from them;

E.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect;

F.      Plaintiff and Damages Class Members be awarded restitution, including disgorgement and restitution of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment, and the creation of a constructive trust to remedy Defendants' unjust enrichment;

G.      Plaintiff and the Class Members be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

H.      Plaintiff and the Class Members recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

I.      Plaintiff and the Class Members have such other and further relief as the case may require and the Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands a trial by jury of all issues so triable, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: January 25, 2017                    Respectfully submitted,

**SHEPHERD FINKELMAN MILLER
  & SHAH, LLP**

By: */s/Jayne A. Goldstein*
Jayne A. Goldstein (Pa. Bar No. 48048)
Natalie Finkelman Bennett
35 East State Street
Media, PA 19063
Tel: 610-891-9880
Email: jgoldstein@sfmslaw.com
Email: nfinkelman@sfmslaw.com

*Attorneys for Plaintiff*